**WALLING, Administrator of Wage and Hour Div., U. S. Dept. of Labor, v. STERLING ICE & COLD STORAGE CO.**
Civil Action No. 1815.

District Court, D. Colorado.
Jan. 6, 1947.

Reid Williams, Regional Atty., and John A. Weiss, Atty., Wage and Hour Div., both of Kansas City, Mo., for plaintiff.

T. E. Munson and Chas. E. Kreager, both of Sterling, Colo., and Brock, Akolt, Campbell & Myer, of Denver, Colo., for defendant.

SYMES, District Judge.

This is an action by the Administrator of the Wage and Hour Division, Department

of Labor against the Sterling Ice and Cold Storage Company—a corporation—to enjoin violations of provisions of §§ 15(a) (1), 15(a) (2) and 15(a) (5) of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 215(a) (1, 2, 5). The matter is submitted after a trial to the court, argument and submission of briefs. During the course of the trial the court found that the defendant was engaged in the production of goods shipped in interstate commerce, thus eliminating that disputed question.

The defendant's business is located at Sterling, Colorado, where it manufactures and sells ice, operates cold storage facilities 'and the sale and distribution of beer. Its operations are rather small, and there is involved in this case only four employees, George Loose, Harry Foster, Charles Bower and Cynthia Davenport, engaged in defendant's interstate operations. Loose is chief engineer and responsible for the operation and maintenance of the ice manufacturing equipment. Bower and Foster are classified as laborers.

Cynthia Davenport is classified on the payroll as cashier. She is also treasurer, holds one share of stock, thus qualifying as a member of the board of directors. She keeps all time records, ledger accounts, personal and payroll records, money received, and does. general office work. She supervises no employees, and there is no evidence she has authority to hire and fire employees, nor does she exercise any real discretion or judgment relating to management policies. One of the questions presented for decision is: Do the employees Loose and Cynthia Davenport qualify as exempt employees or administrative employees within the meaning of § 13(a) (1) of the Act, 29 U.S.C.A. § 213(a) (1)?

The defendant's failure to maintain required records for Davenport and Loose is excused on the ground they are exempt under § 13(a) (1) of the Act, which invests the administrator with power and authority to define the terms "employed in a bona fide executive, administrative, * * * capacity," which the administrator has done in paragraph 541 of the regulations. Sec. 13(a) of the Act provides that §§ 6 and 7, 29 U.S.C.A. §§ 206, 207, shall not apply with respect to any employee employed in a bona-fide administrative, executive or local retail capacity, or in the capacity of outside salesman.

■ In regard to Loose the evidence is clear that he is engaged mostly in manual labor and is not an administrative employee within the definition of the regulations. Neither is he an executive. According to his testimony his work is of the same general nature as that performed by other employees for whom no exemption is claimed. As a matter of fact he is the engineer, employed for definite work involving manual labor, and is not an administrative employee in any sense of the word.

■ The argument in favor of Cynthia Davenport being excluded from the operation of the Act is: She is a corporate officer and serves in an administrative or executive capacity. We take the test to be whether she comes within § 3(d), 29 U.S.C.A. § 203(d), defining an employer as a person who acts directly or indirectly in the interests of an employer in relation to an employee, etc. True she is called an officer and holds one share of stock, hence qualifies, and has been a director since 1941. But the test we take to be the facts as to her actual duties. Joseph v. Ray, 10 Cir., 139 F.2d 409, at p. 411; Walling v. Yeakley, 10 Cir., 140 F.2d 830.

■ We can take judicial notice from this record that like in many small companies she was given a share of stock to qualify her as a director in order to make a quorum, in which capacity she is merely a dummy, so-called. There is no evidence she paid for her share of stock, or ever received any dividend thereon. The company being small, the office force is necessarily small, and Miss Davenport is able to, and does, combine and perform the duties of treasurer, cashier and bookkeeper. However, she signed one of the contracts involved in the case the same as other employees, and the mere fact that she signs checks, disburses funds and attends meetings of the board of directors, and keeps the accounts generally, is not sufficient to change her category as an employee. The record indicates that H. L. Titus, the president, and Robert E. Titus, the vice-president, are the real executive officers of the

company, exercising discretion. Miss Davenport does not have the power to hire and fire, and from every angle it is clear she is an employee and not an executive officer.

Defendant claims Miss Davenport has the management of a customarily recognized department and that she performs the duties of a corporate officer in the business office. This argument is based upon the fact that while her duties are such that she requires no assistants, yet if the business were to increase she would have the direction and supervision of the work of any additional employees in the office. Sufficient to say that situation can be met when it arises, and the question cannot be decided upon suppositions. This also applies to the argument that if there were other employees she would have the right to hire or fire, although at the present time there is no one in her department whom she can supervise, hire or discharge. If we acceded to counsel's views every bookkeeper in a small business concern would be promoted immediately to an executive and employer under the statute, contrary to the intent of the Act. It is our view that assistants not being required in her department, such a department does not exist and she cannot be classified as an executive until the so-called department requires more than her own services. See Joseph v. Ray, supra.

The same reasoning applies to the employee Loose, engaged for most of his time in performing manual labor and none as an administrator. He maintains, repairs, installs, and sees that the machinery works as it should. In his spare time he unloads beer and helps load ice into refrigerator cars as well as working on the dock. He has no authority to hire or fire, and there is no evidence that he is authorized to, or does, exercise discretion.

Counsel in their briefs agree the main question presented is governed by four decisions of the Supreme Court, i. e., Overnight Motor Transp. Co. v. Missel, 316 U.S. 572, 62 S.Ct. 1216, 86 L.Ed. 1682; Walling v. A. H. Belo Corporation, 316 U.S. 624, 62 S.Ct. 1223, 86 L.Ed. 1716; Walling v. Youngerman-Reynolds Hardwood Co., 325 U.S. 419, 65 S.Ct. 1242, 89 L.Ed. 1705, and Walling v. Helmerich & Payne, 323 U.S. 37, 65 S.Ct. 11, 89 L.Ed. 29. Hav-

ing read these cases it appears that the Belo case, supra, is in point, and for our purpose its holdings are not affected by the others cited. The Court in passing upon our identical form of contract said, 316 U.S. at page 630, 62 S.Ct. at page 1226, 86 L.Ed. 1716:

"But nothing in the Act bars an employer from contracting with his employees to pay them the same wages that they received previously, so long as the new rate equals or exceeds the minimum required by the Act."

The case turned upon the meaning of the words "regular rate at which he is employed." The opinion states, 316 U.S. at page 631, 62 S.Ct. at page 1227, 86 L.Ed. 1716:

"But it is agreed that as a matter of law employer and employee may establish the 'regular rate' by contract."

In the case at bar, as in the Belo case, the several contracts state clearly a basic rate of pay for the first 40 hours, and time and one-half of such basic rate for all time over 40 hours a week.

Page 631 of 316 U.S., page 1227 of 62 S.Ct., 86 L.Ed. 1716:

"In the case before us such an effort has been made, and in the example given the regular rate has been specified at 67 cents an hour. The difficulty arises from the inclusion of the $40 guaranty. The problem is whether the intention of the parties to set 67 cents an hour as the regular rate squares with their intention to guarantee a weekly income of $40. The Administrator's position is that these two objectives are inherently inconsistent and that the intention to fix the regular hourly rate at 67 cents is overridden by the intention to guarantee the $40 per week. We cannot agree."

Each individual contract provides the employer guarantees the employee shall receive weekly, for regular time and for such overtime as the necessities of the business may demand, a sum not less than $32. This is done, it is claimed, in order that the law may be complied with without reducing the amount of money each employee has in the past received per week.

Thus the contract complies with the law in that it specifies a lawful, regular

rate for the first 40 hours a week, with overtime at one and one-half that rate. Further, the amount actually paid, according to the payroll, without figuring deductions for social security, etc., complies therewith. Therefore any other provision, such as the guarantee, which does not conflict with the lawful rate agreed upon, is outside the ken of the court.

In the Helmerich & Payne case, supra, the controversy centered around a so-called "split-day plan," and the contract, which the Court found as a fact did not represent the rate actually paid for ordinary non-overtime hours, nor did it allow extra compensation for all overtime hours. At page 42 of 323 U.S., at page 14 of 65 S.Ct., 89 L.Ed. 29, the Court said:

"The Act clearly contemplates the setting of the regular rate in a bona fide manner through wage negotiations between employer and employee, provided that the statutory minimum is respected. But this freedom of contract does not include the right to compute the regular rate in a wholly unrealistic and artificial manner so as to negate the statutory purposes."

And in the Youngerman-Reynolds Hardwood Co., case, 325 U.S. 419, at page 424, 65 S.Ct. 1242, at page 1244, 89 L.Ed. 1705, the Court said:

"The keystone of Section 7(a) is the regular rate of compensation. On that depends the amount of overtime payments which are necessary to effectuate the statutory purposes. The proper determination of that rate is therefore of prime importance."

And:

"They may agree to pay compensation according to any time or work measurement they desire."

The Court then points out that the contract in question was unrealistic in that it failed to provide for the payment of one and one-half times the regular rate for all overtime hours, and it therefore violated the requirements of § 7(a).

In Walling v. Harnischfeger Corporation, 325 U.S. 427, 65 S.Ct. 1246, 1250, 89 L.Ed. 1711, a wage agreement arrived at by collective bargaining provided for compensation at a specified basic rate, or "regular rate." The Court found that "incentive bonuses" provided for resulted in certain employees receiving pay, exclusive of overtime, at a rate higher than the base rate. That this resulted in certain employees receiving hourly rates higher than the base rate. The computation of overtime on the basis of such rate, rather than on the rate actually paid, violated § 7(a).

In our case, for example, to illustrate the wages and hours record of the defendant (Ex. A) shows that Charles A. G. Bower, for the week of May 12, 1946, worked 58 hours at the rate of 50 cents an hour, and his regular wage was listed at $20, and $13.50 overtime. For the two-week period $63.36 was due him. The week of June 9, 1946, he worked 58 hours at the rate of 50 cents an hour. Regular wage $20, $13.50 overtime, and for the two-week period was paid $79.38. Further we find, for instance, for the week of September 1, 1946, he worked eight hours a day, or 56 hours for the week, at the rate of 50 cents an hour. The regular wage is listed at $20, plus $12 overtime, or $32. The week of September 8th was vacation.

Analyzing this, if we take the first week, May 12, 1946, he worked 58 hours. Forty hours at 50 cents would be $20, and 18 hours overtime $13.50. The week of May 19th he worked 54 hours, 40 hours regular, or $20, and 14 hours overtime, or $10.50. Total amount due $63.36, which is the amount shown on the sheet.

The week of June 23, 1946, $20 for 40 hours, and $12 for 16 hours overtime. Week of June 30th he worked 56 hours, $20 for 40 hours and $12 for 16 hours overtime, or a total of $158.75—the amount shown. It would therefore seem that for 1946, and from then on at least, there was full compliance. Furthermore, the minimum amount he received for any week was $32.50, which is a little bit over the guarantee.

George Loose: According to Ex. A he worked at a weekly rate of 40 cents an hour as per his contract. The timesheet shows, for instance, the week of May 12, 1946, he worked 52 hours, which at 40 cents an hour equals $16, plus $7.20 overtime. The week of May 19th he worked the same number of hours for the same amounts. The week of August 4, 1946, he

worked 54 hours. According to the worksheet he earned $16 for the 40 hours, plus $8.40 overtime. The week of August 11th he worked 61 hours for $16 regular and $12.60 overtime. Amount due $52.47. Amount paid $103.93. For example, figuring on a two-week basis, the time covered by each payroll, we find that in the week of July 21, 1946, Loose worked 36 hours at 40 cents an hour, or $14.40, and the following week of July 28, 1946, he worked 42 hours at 40 cents an hour, or $16 regular and $1.20 overtime. After deducting social security he received actually $103.92, which is less than four times his guarantee of $32.30, but over the statutory requirement of 40 cents an hour.

In the case of Jack Bopp, taking at random from his wage and hour record, we find that for the week of May 26, 1946, he worked 46 hours at 50 cents. His regular wage was $20, plus $4.50 overtime. The following week of June 2, 1946, he worked 54 hours and earned $20 regular and $10.50 overtime. Was actually paid $79.63 on May 30th.

The Government's contention that the hourly rate specified in defendant's contracts, to wit, 50 cents, is not the statutory regular rate, because it does not in fact measure the compensation actually received by the employee, and that according to defendant's plan the monthly guarantee actually controls the wage paid for a normal work week, or the bi-monthly pay period adopted by defendant. This guarantee, however, is nothing more than a minimum. It does not prevent employees receiving—as they did in many cases—a higher amount per week than the minimum guarantee. And when the payroll is tested we find that the defendant now, and has since May, 1946, been keeping records (Ex. A), which shows this. For instance it shows in the case of employee Loose that the week of June 23, 1946, he worked 56 hours at 40 cents an hour—the contract rate—and the following week 62 hours at 40 cents an hour, or a total of $54.80. After deducting social security he actually was paid $103.92, which is less than four times his guarantee of $32.30, but over the statutory requirement of 40 cents an hour.

Mr. Justice Byrnes writing the opinion in the Belo case, supra, said that the regular rate may be established by contract, and it is not an objection that its object may have been to permit as far as possible the payment of the same total weekly wage as that paid prior to the Act. The objection here, as in the Belo case, is that the basic rate and the overtime rate are so artificial that the parties to the contract cannot fairly be supposed to have intended that it be so construed. But, as we have seen on this record, we cannot agree that such is the case. In every instance the employee receives the agreed basic or regular pay for the first 40 hours, and one and one-half times that for all overtime. If, in addition, he received more by virtue of the guarantee, that did not alter the fact that the statutory rate was paid. And, as Mr. Justice Byrnes said, 316 U.S. at page 635, 62 S.Ct. at page 1229, 86 L.Ed. 1716:

"* * * it is well to follow the Congressional lead and to afford the fullest possible scope to agreements among the individuals who are actually affected."

In the case before us when the minimum hourly wage was first fixed in the contracts, the basic rate was closely related to the amounts actually received by the employees. Since that time, however, the guaranteed amount has been repeatedly increased, yet the basic rate agreed upon and paid is still equal to, or in excess of, that established by law and that is the sole concern of the plaintiff. As the defendant argues the employees knew what they are to get, and that they were bound to be paid full time and time and one-half for overtime, or the guaranteed amount, whichever was the greater. So the mere fact that the guaranteed amount exceeded the amount payable on time plus time and one-half for overtime at the basic rate, does not brand the contract as illegal, because as said in the Belo case, 316 U.S. at page 632, 62 S.Ct. at page 1227, 86 L.Ed. 1716:

"It is also true that under this formula the overtime rate per hour may vary from week to week. But nothing in the Act forbids such fluctuation."

And in Walling v. Helmerich & Payne, supra, the Court in distinguishing the Belo

case said, 323 U.S. p. 42, 65 S.Ct. at page 14, 89 L.Ed. 29:

"Nothing in this Court's decision in Walling v. [A. H.] Belo Corporation, supra, sanctions the use of the split-day plan. The controversy there centered about the question whether the regular rate should be computed from the guaranteed weekly wage, or whether it should be identical with the hourly rate set forth in the employment contract."

The plaintiff asks for injunctive relief on the ground that the records of defendant are not in accord with the law or regulations. Admittedly the defendant is, and has for nearly a year, fully complied with the statute and regulations in this respect, and there are no grounds shown upon which it may be said that this situation will not continue. That is, that they now keep a record of the actual hours worked each day, the total hours worked each week, and the regular hourly rate for the computation of overtime, and the amount paid. And further, Exhibits B, C, D and E show that the employees now sign and submit to the office the number of hours worked each day and each week. And a Government witness—Peterson—stated unequivocally that the records now were in full compliance.

The Government asks for judgment permanently enjoining and restraining the defendant, its officers, agents, employees, etc., from violating any of the provisions of the Act charged in the complaint as violated. No other relief is asked.

This particular form of proceeding (§ 217, Tit. 29, U.S.C.A.) authorizes the district courts of the United States "to restrain violations of section 215 of this title." Sec. 215 denounces the prohibited acts. This makes it a suit in equity to enjoin the defendant from the alleged violations. The statute is in no sense mandatory, conferring jurisdiction only. Therefore adequate cause must be shown agreeable to equity principles. So sitting as chancellor we exercise the sound discretion recognized as applicable in such matters, in order to put an end to the evils denounced by the Act. Lenroot v. Interstate Bakeries Corporation, 8 Cir., 146 F.2d 325. See also Walling v. Gulf States Paper Corporation, 5 Cir., 143 F.2d 301, at page 303.

In Hecht Co. v. Bowles, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754, the Supreme Court held under similar provisions of the Emergency Price Control Act, 50 U.S.C.A. Appendix, § 901 et seq., that the showing that defendant had engaged in acts or practices violative of the Act, the granting of an injunction is not mandatory, but is in the discretion of the court, which must be exercised in the light of the larger objectives of the Act. That the standard of the public interest, not the requirements of private litigation, measure the propriety and need of injunctive relief.

In that case the court below found that the mistakes brought to light were at once corrected, that there was no doubt of the good faith and diligence. And, 321 U.S. at page 327, 64 S.Ct. at page 591, 88 L.Ed. 754:

"We agree that the cessation of violations, whether before or after the institution of a suit by the Administrator, was no bar to the issuance of an injunction under § 205 (a)."

Page 328 of 321 U.S., page 591 of 64 S.Ct., 88 L.Ed. 754:

"But we do not think that under all circumstances the court must issue the injunction or other order which the Administrator seeks.

"It seems apparent on the face of § 205 (a) that there is some room for the exercise of discretion on the part of the court."

And Mr. Justice Frankfurter stated in concurring (321 U.S. at page 331, 64 S.Ct. at page 592, 88 L.Ed. 754), that the Emergency Price Control Act " * * * does not change the historic conditions for the exercise by courts of equity of their power to issue injunctions * * *."

Page 329 of 321 U.S., page 592 of 64 S.Ct., 88 L.Ed. 754:

"The historic injunctive process was designed to deter, not to punish. The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it."

The opinion then observes that such a major departure as the Government asks for from the long tradition as is here pro-

posed should not be lightly implied. Therefore, the court states that it resolved the ambiguities of § 205 (a) of the Act, 50 U.S.C.A.Appendix, § 925 (a), there considered in favor of that interpretation "Which affords a full opportunity for equity courts to treat enforcement proceedings under this emergency legislation in accordance with their traditional practices, as conditioned by the necessities of the public interest which Congress has sought to protect."

We conclude that:

(1) George Loose and Cynthia Davenport are not corporate officers and do not serve in an executive or administrative capacity, and are therefore subject to the Fair Labor Standards Act, and that the complainant is entitled to injunctive relief as to them.

(2) That the defendant has entered into bona fide agreements with all its employees concerning wages and hours, all in full compliance with the Fair Labor Standards Act, and on this branch of the case no relief should be granted.

(3) That the records of the company are now, and have been for sometime, in full accord with the law and the regulations imposed by the Administrator, and that there is no reason to believe, or grounds for the belief, that the defendant will not in the future comply with all the regulations as it is now doing, and injunctive relief in respect to the records of the company is not necessary.

It is so ordered.